**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**JOSEPH Q. REEDER,**

        **Petitioner,**

        **v.**

**WARDEN, OHIO STATE
PENITENTIARY,**

        **Respondent.**

        **CASE NO. 2:19-CV-105
JUDGE MICHAEL H. WATSON
Magistrate Judge Chelsey M. Vascura**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner who is proceeding without counsel, brings this Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the Petition, Respondent's Motion to Dismiss, and the exhibits of the parties. For the reasons that follow, the undersigned **RECOMMENDS** that Respondent's Motion to Dismiss (ECF No. 7) be **GRANTED** and that this action be **DISMISSED.**

### I.

Petitioner challenges his convictions pursuant to his plea under *North Carolina v. Alford*, 400 U.S. 25 (1970), to aggravated robbery, involuntary manslaughter with a firearm specification, and tampering with evidence. The Ohio Tenth District Court of Appeals summarized the facts and procedural history of the case as follows:

> {¶ 2} On February 4, 2013, Reeder shot and killed Anthony Hines in Reeder's home on the east side of Columbus, Ohio. Following investigation, a detective of the Columbus Division of Police filed a complaint against Reeder on February 5, 2013, alleging that Reeder had committed the crimes of murder, aggravated robbery, and tampering with evidence. In a hearing held the same day, the juvenile court determined there was probable cause to proceed and ordered Reeder held in custody.

{¶ 3} A psychiatric evaluation of Reeder followed, along with stipulations by counsel as to service, Reeder's age at the time of the offenses (14 years old), and the fact that probable cause existed as to each count. On October 10, 2013, the juvenile court found probable cause for bindover and set a hearing on the matter. The hearing commenced January 13, 2014 and took place for four days.

{¶ 4} The investigating detective, Ronda Siniff, testified first. She stated that, around 6 p.m. on February 4, 2013, she was notified of the incident between Reeder and Hines. Soon thereafter, Reeder and his grandparents flagged down a police car, and Reeder surrendered himself into police custody. Siniff then interviewed Reeder in a videotaped interview. According to Reeder (as relayed by Siniff and as observable in the videotape) he was at home alone with his younger brother when Hines came to the house seeking to purchase marijuana. Reeder's mother's boyfriend sold drugs out of the home, but he was not there to make the sale to Hines. Reeder told Hines to leave and Hines telephoned and spoke to Reeder's mother's boyfriend who also told Hines to leave. However, Hines did not leave. Instead he sat down on the couch. When Reeder again refused to sell Hines marijuana Hines punched him in the face. Reeder fled upstairs and retrieved a handgun.

Downstairs again, Reeder attempted to shoot Hines who, according to Reeder, was still irate. The gun did not fire because the safety was on. Seeing that Reeder had tried to shoot him, Hines became angrier and chased Reeder downstairs into the basement. Reeder turned around as Hines reached the bottom of the stairs and, having disengaged the safety, shot Hines in the face.

{¶ 5} According to Siniff and the videotape, Reeder admitted that after shooting Hines, Reeder went through Hines' wallet and threw its contents in the air as he left the house. He also took Hines' car using Hines' keys. Reeder denied having gone through Hines' pockets, however Hines' pockets were pulled out, and the investigation later turned up Reeder's DNA inside Hines' pockets. Reeder threw the gun out the window as he drove Hines' car and, after attempting to give Hines' car to some "crack heads," he abandoned it and walked to his grandparents' house. (Jan. 13, 2014 Tr. 47.)

{¶ 6} Siniff also testified about an interview she conducted with Reeder's grandmother, and a recording of the interview was introduced.

In the interview Reeder's grandmother told Siniff that Reeder called stating he had shot someone. He came to her house at her request and told her what had happened. According to Reeder's grandmother, Reeder said someone (whom Reeder did not identify but whom we now know to be Hines) came to his house looking to buy drugs and refused to leave, and, instead, sat on the couch. So Reeder eventually said, "Okay, I gotcha (sic), come on." (Jan. 14, 2014 Tr. 105.) He walked downstairs and Hines followed him. Once Reeder turned the corner downstairs he shot Hines. The audio recording of the interview confirms Siniff's account of the interview with Reeder's grandmother. The recording also contains other details.

According to Reeder's grandmother, Reeder initially told his grandmother that he had burned Hines' car, but later told her where it was. Reeder did not mention having done anything with Hines' wallet. In addition, Reeder's grandmother made clear that Reeder did not change clothes while at her house.

{¶ 7} When Reeder's clothing was tested, none of Hines' blood was found on it. But the investigation did find some of Reeder's own blood on his clothing which, Siniff admitted, may have come from being hit in the face. In addition, Reeder consistently rubbed his jaw during the video interview including at times when he was alone in the room.[2]

{¶ 8} Photographs of the scene that were introduced as exhibits during the hearing show that the basement was a single room with an open flight of wooden stairs dividing the room in the center. From the vantage point of descending the stairs, Reeder's bed was directly to the left of the terminus of the stairs with only a few feet between the end of the stairs and the foot of the bed. According to a crime scene investigator from the Bureau of Criminal Identification and Investigation of the Ohio Attorney General's office who testified on the second day of the hearing, Hines was found with his feet facing the bed and his head extended toward the stairs. There was, however, some evidence that the body had been disturbed either by the shooter or by medical personnel. Hines' body showed gunpowder stippling on his face indicating that he was shot at short range. The bullet passed through his face and out the back of his head and was recovered near the head of the bed. Considerable blood was present on the bed and stairs, and numerous small white porous fragments believed to be bone were found on and near the bed. Other than that, Hines was determined to be near the bed and not on the stairs when he was shot; the crime scene expert was unable to testify as to Hines' and Reeder's relative positioning or whether and how each was moving at the time Hines was shot.

{¶ 9} A grandnephew of Hines also testified. He confirmed that Hines smoked marijuana. He testified that Hines had difficulty remembering relatives' names and lived in a senior home. He also testified that, despite Hines' relatively young age (64), Hines had considerable health problems, and he described Hines as "frail." (Jan. 15, 2014 Tr. 20.) Although the autopsy report listed Hines as 5′ 9″ and 252 pounds, this witness testified that he believed the weight was an error and estimated Hines' weight at more like 120, 130, or at most 175 pounds.

{¶ 10} Relevant to the question of Reeder's bindover to adult felony court in the general division, an expert, Dr. Speicher–Bocija, who had evaluated Reeder, testified and concluded that the safety of the community would not be endangered if Reeder were kept confined by the Ohio Department of Youth Services rather than transferred to adult court. Although Dr. Speicher–Bocija admitted that in drafting her report she had not considered certain juvenile criminal court incidents in Reeder's past nor a previous evaluation, even being confronted with that additional information at the hearing did not change her ultimate conclusion. She testified that

in her professional opinion Reeder was amenable to rehabilitation in a secure juvenile facility. She estimated an over 50 to 55 percent chance that Reeder could be rehabilitated by age 21 but acknowledged that there can never be certitude about such questions.

{¶ 11} Following oral argument on January 16, 2014, the final day of the hearing, the juvenile court orally analyzed several of the factors involved in a bindover determination and announced that it had decided to relinquish jurisdiction over Reeder's case and bind him over for proceedings in the general division. The next day the juvenile court memorialized its oral decision in an entry relinquishing jurisdiction for bindover. On February 4, 2014, the juvenile court released a more detailed decision setting forth the facts and factors considered in reaching the decision to bind Reeder over for trial in the general division.

{¶ 12} Following the bindover order, a grand jury indicted Reeder on February 10, 2014, for aggravated robbery with a gun specification, aggravated murder with a gun specification, and tampering with evidence. Reeder entered a not guilty plea on February 12, 2014. Approximately one year later, in a hearing held on February 2, 2015, Reeder entered an Alford plea to aggravated robbery without a gun specification, involuntary manslaughter with a gun specification, and tampering with evidence. After obtaining a presentence investigation and opposing sentencing memoranda from the defense and the state, the trial court reconvened on March 5, 2015, for a sentencing hearing at which it ordered Reeder to serve a total of 17 years at the Ohio Department of Rehabilitation and Correction. Specifically, the trial court sentenced Reeder to serve 4 years for aggravated robbery, 10 years for manslaughter with an additional 3 years for the gun specification, and 18 months on the tampering count. The trial court ordered Reeder to serve all counts and the specification consecutively to one another, except for the tampering, which Reeder was permitted to serve concurrently with the other counts and specification. Reeder now appeals.

II. ASSIGNMENTS OF ERROR

{¶ 13} Reeder presents two assignments of error for review:

[I.] The Juvenile Court erred by finding that Appellant was not amenable to rehabilitation in the juvenile court system without articulating its reasoning in a manner sufficient to permit meaningful appellate review.

[II.] The decision of the Juvenile Court granting the State's motion for discretionary bindover was erroneous.

*State v. Reeder*, 57 N.E.3d 458, 459-62 (Ohio 2016). On January 21, 2016, the appellate court affirmed the judgment of the trial court. *Id.* On May 18, 2016, the Ohio Supreme Court declined to accept jurisdiction of the appeal. *In re Reeder*, 145 Ohio St.3d 1472 (Ohio 2016).

On January 7, 2019, Petitioner executed this *pro se* habeas corpus Petition. (ECF No. 1-1, PAGEID # 28; ECF No. 3, PAGEID # 47.) As his sole claim for relief, Petitioner asserts that he was denied due process because the state courts unreasonably applied or contravened the United States Supreme Court's decision in *Kent v. United States*, 383 U.S. 541 (1966). It is the position of the Respondent that this action should be dismissed as barred by the one-year statute of limitations under 28 U.S.C. § 2244(d).

## II.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which became effective on April 24, 1996, imposes a one-year statute of limitations on the filing of habeas corpus petitions. 28 U.S.C. § 2244(d). The statute provides:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State postconviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

*Id*.

Here, under the provision of § 2244(d)(1)(A), Petitioner's judgment of conviction became final on August 16, 2016, ninety days after the Ohio Supreme Court's May 18, 2016 dismissal of his appeal, when the time period expired to file a petition for a writ of *certiorari* with the United States Supreme Court. *Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012) (citing Clay v. United States, 537 U.S. 522 (2003)). The statute of limitations began to run on the following day, and expired one year later, on August 17, 2017. Petitioner waited more than one year and four months, until January 7, 2019, to execute this habeas corpus Petition. Further, the record does not reflect that equitable tolling of the statute of limitations applies. *See Holland v. Florida*, 560 U.S.641, 649 (2010) (In order to establish entitlement to equitable tolling, a petitioner must establish that he has been pursuing his rights diligently and that some extraordinary circumstance stood in his way and prevented him from timely filing) (citing *Pace, 544 U.S. at 418)).

### III.

For the foregoing reasons, it is **RECOMMENDED** that Respondent's Motion to Dismiss (ECF No. 7) be **GRANTED** and that this action be **DISMISSED**.

### Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those

portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

**IT IS SO ORDERED**.

/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE